I'd like to reserve a few minutes for rebuttal. I'd like to address two main issues for the Court this morning, the first being the 404B evidence and the second relating to the sentencing. Beginning with the 404B evidence, as the Court is aware, the District Court allowed, over three weeks before the events in this case, Mr. Dais received delivery of what turned out to be ecstasy and the ecstasy was then taken to a residence. The residence was searched and the drugs were acknowledged that the pseudo-infedrin pills would be used to make methamphetamine. In order for such evidence to be presented, of course the indictment didn't charge ecstasy, so in order to allow evidence to be introduced for that purpose under 404B, you have to show a logical connection. You have to show that proof of the ecstasy would somehow connect or prove that he had knowledge that the pseudo-infedrin pills would be used to make methamphetamine. There's been a number of cases in this circuit and other circuits that have dealt with this issue of what is a logical connection. Specifically, they deal with cases, and in this case we're talking about two different drugs. In cases where you have two different drugs, it appears that it's often the connection is lacking. As the courts, and on pages 10 and 11 of our opening brief, we list a number of cases that have dealt with this question of the lack of connection. Well, yeah, but here you've got a situation where the prior transaction was relatively proximate in time, several weeks before, was quite similar in the way it went down, and goes to show that Diaz knew that the pills were not going to be used for cough syrup or nasal spray or whatever, but were rather for an illegal purpose. So why doesn't that suffice with a curative instruction which was given? Because that wasn't the issue. The issue wasn't whether the ecstasy pills were going to prove that he knew that the pseudo-infedrin pills were illegal. The issue was whether, and that's the next step, is whether those pills would be used to make methamphetamine. You have to show the other. It's saying the same thing I just said. No. They're going to go to be used for an illegal purpose rather than to go they're going to be used for methamphetamine instead of for cough syrup. No. You may be able to show that pills were going to be used for an illegal purpose. That doesn't mean that you're aware and are familiar with the process of making methamphetamine. Well, that's solved by the fact that he said he knew that they were going to be cut. Well, I'm going to get to that. That's a question of what other evidence there might be introduced on this question of knowledge. But I'm talking now about the question of whether the ecstasy proof should have been admissible. And cases are pretty clear. For example, in Martinez, the court noted that the prior sale of heroin does not prove that a defendant knows how to prepare crack cocaine or knows how to cook methamphetamine. And in Hernandez-Miranda the issue here is what he knew about the drug, what he knew about what he was doing. Well, the issue here is whether he knew that those pills would be used to make methamphetamine. As contrasted with cough syrup or something else. Well, as contrasted to whether the pills, which in small quantities are illegal, but whether those pills would be possessed for an illegal purpose. But there's a jump then to say that he knew the illegal purpose was to make methamphetamine. They have to show a connection between the knowledge of methamphetamine. And the cases, I think it's put well in this Hernandez-Miranda case where the court said the greater the dissimilarity in the two drugs, the more tenuous the relevance. So in cases where you have different drugs, you have, I think, a greater burden to show that there's a connection. So what do you do with the testimony of the witness? He told me, he told me, I sell it for, I buy it for a thousand a case. So I told him, how much do you sell it for? He said, I sell it for a thousand for a hundred or thirteen hundred. And I told him how much the Mexicans buy it. I told him, how much do the Mexicans buy it from you? So he said, they buy it from me for approximately thirteen, fourteen hundred. And then they sell it to the higher price and they make drugs out of it. The Mexicans, after they cook it and make it ready for illegal drugs, they sell it for a higher price. That's what he told me. Yeah. What do you make out of that? This was a trial exhibit. Yes. Excerpt 0117, a witness talking about a conversation with your client saying you get this drug. You give it to the Mexicans for a higher price. They make drugs out of it. I mean, there was other evidence that related to the to the knowledge element in the case that that may be one of it. That was some testimony from certain co-defendants that talked about the issue of knowledge. But the co-defendant testimony is could well be suspect. I mean, I I think the question perhaps, at least for me, is let's assume let's take your argument and say that the 404B evidence should not come in. Right. Does the extra evidence make it then harmless error? I don't think it's harmless. Let me address that now. First of all, when the district court was considering whether it would be this evidence should be admitted, the district court noted that there was a lack of much evidence with regard to knowledge. I think the district court was right. The main evidence, other evidence besides the 404B evidence came from the two co-defendants, Allistaff and Keffey. And these were co-defendants who made deals with the government. And I note that there's a Gomez case that a learner justice or judge a few months ago by the name of Trott recognized that this is in denying a wiretap motion. And in talking about the reliability of informants, Judge Trott said, quote, the truth seeking function of our courts is greatly enhanced when the evidence used is not tainted by its immediate informed source and has been cleansed of the baggage that always comes with them. I think there was baggage that came with these two co-defendants. For example, Mr. Allistaff, he acknowledged under cross-examination that he originally lied to the police when he was questioned and said that the pills were really herbal life. That was what was in the boxes. It wasn't an illegal substance. Then when he entered his plea of guilty before the court, he told the district judge that he did not know that there were pills in the box, and he did not know that they were used to make methamphetamine. He said to the judge repeatedly, and then finally the third time, he acknowledged to the judge that he did know that. So his credibility was suspect, plus what his testimony was not really supported by any transcripts of his conversations with Mr. Dayas. So the jury well could disbelieve him. And Ms. Caffey made a deal with the government, essentially on the eve of trial, where she eventually got a two-year sentence and gave testimony that supported the government's case. The jury may well have disbelieved her based on a recognition much like Judge Trott recognized in Gomez. The government also cites this Exhibit 56 where there's some mention of the word black, and the government says, well, that's really iodine, and therefore the defendant knew about the process of making methamphetamine. But if you actually look at Exhibit 56, which is on Excerpt of Record 10, the testimony went like this. Mr. Nugent said to Mr. Dayas, no, no, the black, the one they do for cooking, remember? Mr. Dayas said, I don't understand, man. Nugent, the black one, the one they use it for cooking. Mr. Dayas, for cooking? Mr. Nugent, the black one. Mr. Dayas, black? Mr. Nugent, aha, Mr. Dayas, I said not, I don't say black, white. So that really doesn't support any- I said China. No, ice, ice crystal. Yeah, yeah, they have it. Yeah, they have it. Right, but ice crystal does not support a belief that he understood the processes of making methamphetamine. That is, the reference to black being iodine and iodine being a chemical used in that process. So that transcript does not support the argument that he knew about the making of methamphetamine. All right, what other issues would you like to tell us about? The other issue has to do with the sentencing. As you recall, Mr. Dayas was sentenced to 310 months. That was 240 months on count one and 70 months on count two. Count one involved two objects of that conspiracy. The first one was conspiracy to aid and abet the manufacturer of methamphetamine. The second was conspiracy to possess the pills. In the district court below, we cited Velazquez, a Third Circuit case, asking the district court to not stack the sentences, but to sentence him based on 240 months, which is what occurred in Velazquez. And we essentially- and this really was premised on the striking of the first overt act, I mean, the first object of the conspiracy. And so if the first object of the conspiracy was stricken, you were just left with an object where he conspired to possess the pills and a substantive count where he possessed the pills. And Velazquez says that the guidelines in those kind of cases really favor concurrent sentences and not consecutive sentences. But the district court opted to give consecutive sentences, reject Velazquez essentially the way I read it, because you had the first object of the conspiracy, conspiracy to aid and abet the manufacturer of methamphetamine. Our position is that that object should have been stricken for two reasons. First of all, you can't aid and abet an offense when you don't have a principal committing the offense. The offense being the sale of methamphetamine. So you can't- since there was no evidence that methamphetamine was ever sold, you can't aid and abet the sale of something that didn't occur. You don't have a principal doing it. So you can't have an aid and abet of a crime. And the question becomes, can you have a conspiracy to aid and abet? I don't believe you can have a conspiracy to aid and abet something that could not occur. Since you could not aid the sale of the manufacturer of methamphetamine because it never occurred, I don't think you can have- Well, we've said that. Sorry? It's not so. I mean, we've said that's not so in Bosch and Frink and a bunch of other cases. Well, I- I mean, isn't all that was required was to show an intent to possess with a- to show of aiding and abetting with an intent to possess for manufacturing? I'm sorry. I didn't hear that. I don't- You don't have to show that manufacturing occurred. You don't have to show or identify the person who was doing it. Don't you just have to show that Diaz conspired with the intent to- to enable manufacturing to occur? Well, but- but the- the charges, conspiracy to aid and abet- I understand. Manufacturer. I don't think you can- I think you have to do more than simply show an intent. I think you- the question is whether if you can't aid and abet the crime, in other words, there's no principle doing the crime, the question is if you can't aid and abet the crime, can you conspire to aid and abet something that can't happen? I don't understand why it can't happen. Well, it's- Supplying the ingredients. It can happen. We just don't know who did it. Well, it couldn't happen in a- in this case because there's no evidence there was any manufacturing that was ever done. So? Well, if there was no- if there was no manufacturing that was ever done, then you can't aid and abet something that was never done. And so the question is whether you can conspire to aid and abet something that never happened. I don't believe you can unless you knew about a conspiracy to manufacture the drugs, that is, some third parties manufacturing the methamphetamine. And it doesn't appear you can. I- the closest case I saw was Falcone out of the Supreme Court, where the defendants had supplied ingredients that were used to- for illegal distillery. And the question was whether they could be prosecuted for conspiring to violate the revenue laws, which some other party was doing. And if they didn't know about the violation of the revenue laws that some other party was doing, the court said that they couldn't be found guilty of that conspiracy to do that. It seems analogous in this case. If there's no knowledge of any third party manufacturing the methamphetamine, it doesn't seem that you can conspire to aid and abet that. Counsel, you've made your points. Why don't we hear from the other side and we'll give you an opportunity to respond. Thank you. Good morning, Your Honors. Peter Hernandez on behalf of the United States. I'll tell you what I have- the problem I have with your case. First of all, I think the 404B decision was wrong. Secondly, I'm not sure it was harmless. With regards to the- let me address the 404B evidence, Your Honor. The question here is whether the district court abused its discretion. Right. Because you were trying to prove that the pseudoephedrine would be used to manufacture methamphetamine, and I don't see what the ecstasy has to do with that at all. Your Honor, the focus has been placed too much on the particular drugs. The government's position with regards to the evidence was to show the underlying activity showing this prior MDMA transaction was similar to the transaction that took place three weeks later. That's great, but you're trying to use it to show that he knew that the pseudoephedrine would be used to manufacture methamphetamine. That's a completely different game, isn't it? It's- it's- the government was trying to show that the defendant possessed pseudoephedrine knowing or having reasonable cause to believe that the Lysolone chemical was going to be used to manufacture a controlled substance. Well, is that enough? I thought it had to be used to- to show that he was using it to manufacture methamphetamine. A controlled substance isn't enough. The- a controlled- the jury instruction says controlled substance, that that's what the- the- and that's the way the indictment is written. In addition, that's the way the conspiracy to aid and abet- or not the- the- the substantive count reads as well. That's what the- that's what the government has to prove, and that's what the government attempted to- to show defendants' knowledge with regards to- to this particular type of evidence. The manner in which he acted right before that MDMA transaction was similar to the- the manner in which he acted right before that pseudoephedrine transaction. The fact that- How does that show that he knew about the manufacturer that was a precursor chemical? Your Honor, it- it helps with- it helps to show knowledge because it helps to show one that he knew it was- this wasn't- he wasn't going to sell the pseudoephedrine to- to the local Stavon. We understand- I understand your- your argument that it showed a general pattern of illegal activity, and let's just set that aside. Okay. That they knew the drugs were legal. How does it go to show that he knew that this drug was going to be used in the manufacturer? Well- You take a finished product and you sell it in a- in a similar way, and then you take essentially an unfinished product. Which illegal if used for the purpose of doing something- Right. It shows- it shows possession. That's the second object of the conspiracy, perhaps. But how does it show that it's going to- he knows it's going to be used in the manufacturer? Because he's acting in a very similar way as how he acted three weeks before when he was selling this- So if it would- so let's- let's say that he was selling stolen CDs. He was fencing something. Your argument would be the same? It would essentially be the same, Your Honor. I was going to think of the example of- of if he had gone to the Stavon across the street and stolen some- some television, the fact that he knew something was wrong, the fact that he knew that his- what could be conceivably be a- a legitimate product wasn't going to be used for a legitimate purpose. It was going to be used for an illegal purpose. And the government needed to show that- that extra element in this particular case, and- and the court allowed, based on the government's request, to provide this type of evidence. I- I just have a hard time equating manufacturer's sale in terms of the knowledge. I mean, I don't- I just don't see it as probative. Well- Again, I'm expressing my concerns. I'm not- No, I understand, and maybe I'm not articulating it as well as- as I should have, but at the- at the more- at the point in time where the defendant was possessing or attempting to possess that pseudoephedrine, he was essentially looking, thinking, and feeling the same way, essentially, as he thought, felt, and did three weeks before when this controlled substance was being distributed to Orange County. The defendant didn't act any differently. Okay. But here's the argument that was made. I think you had drawn inference that he would have known that pseudoephedrine would be a precursor to methamphetamine. Manufacture. Right. How does the sale of ecstasy have anything to do with the knowledge that it would be a precursor to the manufacture of methamphetamine? Again, Your Honor, I think it's not necessarily the sale. It's the action that the defendant undertook prior to the sale. The manner in which he communicated with his source and with his customer before the sale, the manner in which he received the contraband in April, and the manner in which he essentially distributed was similar, eerily similar, to the manner in which he communicated with Defendant Alustad and with Defendant Negrete before the- the deal, the way in- in which the pseudoephedrine was transferred from one trunk to another by Defendant Caffey, and- and the manner in which it was the following day. That's what the government is essenti- No, but- but the argument was it's- it's- it's drugs. It has a chemical name, therefore, he must know it's a precursor. And that's- the similarities transaction. I mean, I understand your argument on that. And- and maybe I'm just being a dead horse. I just don't see the- that it's- it's certainly prejudicial. We know that. Certainly, it is. And it conceded. And- And Your Honor, to some extent, it may not have gained- it may not have answered the ultimate question. But at the very least, the government believes that the evidence was probative. Well, if it doesn't answer the ultimate question and it's prejudicial, it's a problem. Well, it's a problem. But the limiting instruction, Your Honor, focused the jury on this particular type of evidence only going to one particular element, which was the knowledge. Which was the key element in the case. Which was the key element in the case, which the government had other types of evidence. And it suggests that that- this MDMA evidence is relevant to show the other element- the element that's at play in the case. Well, let's- let's say we- let's assume for a second that we- we might find a problem with the 404B. Was it harmless? It certainly was harmless, Your Honor. The government had plenty of evidence, I would argue, to show knowledge. Now, it comes with the same types of risks that counsel alluded to earlier with regards to the cooperating defendants. But even taking the- the cooperating defendants aside, Your Honor, we had a wiretap here where the defendant spoke in coded words with both his customer and his supplier, indicating a transaction was going to take place. He discussed with the- the source that the- Is this the May 13 transcript? With regards to the coded language? Yeah. It's the- it's the calls with Defendant Negrete leading up to the May 17th transaction. And in addition to that, the- the prior- This is- the one I'm looking at is between your- the defendant and Tony Nguyen. That's a separate- that's- that's additional evidence. That's an additional one. Yeah. I'm talking about the- the conversations leading up to the May 17th transaction. With Negrete. With Negrete. And what is- what do we find if we look at that? And we- we find that they- they say- they talk in coded language, essentially talking numbers. I need 20. How much do you want to buy it for? I'll sell it to you for 16. No, give me- no, I'll sell it- I'll buy it for you for 14. Indicating not $16, not $14, but $1,600, $1,400, which was the average cost of a case of pseudo ephedrine, which was essentially- And there was testimony about all of that? There was testimony and there were- and there were oral- there were intercepted conversations that were played in- in court. But I mean, this whole decoded testimony and the- what they were talking about was decoded by a DEA agent? It was decoded by agent- agent Connors. It was- it was- there was also expert testimony by agent Klammer from the DEA noting that these transactions, they often talk in- in coded language. They talk as- to methamphetamine. Certainly, Your Honor, because if- if Walmart is attempting to buy pseudo- pseudo- ephedrine from its supplier, Bayer or whatever, they're not going to necessarily talking in coded language and- and discuss a- a legitimate transaction by- Right, but I mean, you could substitute marijuana, you could substitute any finished product, if you will, and- and your argument is it doesn't make any difference. You don't have to prove that he knew it was a precursor to manufacture. Well, we have to show that the defendant knew or had reasonable cause to believe that- that this was going to be used to make methamphetamine. Right. And the way we show that, in addition to- to the testimony of the cooperators, was through these coded conversations that the defendant had with his customer and his source, with the testimony of the- the cooperator where he used merchandise as a code word for pseudo-ephedrine, with the- with the conversation that Judge Trott brought up with Tony Nguyen, where they're talking about black or crystal, which was another precursor chemical used in the manufacture of methamphetamine, i.e. iodine, which there was testimony to that effect by Agent Clemmer that those two terms are often used to describe iodine. Yeah, but you must admit that the defendant seemed to be saying in that conversation, I don't know what you're talking about. Well, Your Honor, we only read, or you- counsel only read a brief excerpt of that- of that conversation. He didn't read the- the totality of that conversation in which he essentially affirmed, okay, I'll get back with you, or something to that effect. Right. But it was- I think it was in the question of knowledge of what- this was iodine. You know, that- that was pretty- it's pretty vague. Let me ask you another point. This is on the harmlessness. When the government came in to introduce this 404B, it emphasized to the court that this was critical evidence because they'd lost a witness who was not going to testify. And so government counsel says, therefore, this particular evidence, I'm talking about the sale of the ecstasy, becomes even greater, more probative, to show that the defendant had some sort of knowledge this stuff was going to be diverted into methamphetamine manufacture. And we talked about over the weekend that one of the- they lost a witness because this counsel says he's no longer going to be testifying for the government. So you go in and say, boy, this is critical evidence. And the court says, okay, we're going to admit it. And now you say, ah, it's not critical. Well, Your Honor, I mean, any piece of evidence is critical, especially in these types of cases where the government has to show more than just he possessed it. Well, then how can it be harmless? Well, because- If I have it both ways. Well, no, I'm not- I'm not trying to have it both ways, Your Honor, because I do believe that even taking the 404B evidence, even taking one or possibly two of those cooperators, the government still has sufficient evidence based on the context of these conversations leading up to the transaction and based on the use of rental cars, the storage locker, the fact that, you know, he makes these comments to that- to an individual to drive carefully. The government had sufficient evidence to support these convictions on both counts. The issue with regards to the evidence that the government lost out on was due to some unfortunate incident over the week- over the weekend before trial where that particular witness decided not to, for whatever reason, decided not to testify. Now, the issue there was he was going to testify similar to what the other two cooperators were going to testify to. Whether or not that would have gotten us anywhere, who knows? But the fact is that, to some extent, the 404B evidence was not- the district court did not abuse its discretion, the government believes. And even if it did or if the court believes so, the government would urge the district court to look at the other evidence that was introduced. We'll do that. What about the sentencing issue? With regards to the sentencing issue, Your Honor, it's- again, it's a matter of discretion. And let me just take a few minutes just to explain what occurred here. You had two counts. Within the first count, you had two objects, the aiding and abetting and the C2 count, which I'll call the possession count. The aiding and abetting had a life sentence, but the probation officer had come out at a lower offense level on the guideline range, a 36 as opposed to a 38. For the possession object, the stat max is a 20-year. However, given the new guidelines, the guideline range was a 38. So under guideline section 3D, 1.2D, and 3D, 1.3D, the higher base offense level controls. In this case, it would be the 38 for the possession counts, which have the stat max. So what the court did was it looked at 5G1.2, which provides for the court to sentence a defendant to a consecutive sentence in order to achieve a total punishment. But doesn't that do with- I mean, doesn't that do with the statute prohibits in a sense? And I understand the parsing of the two objects on this, but basically, I mean, you see a fair number of cases where you've got conspiracy, aiding and abetting. You've got four or five counts that charge- raising different charges based on essentially the same conduct. And the statute seems to say, well, you ought to, in that context, impose a concurrent rather than consecutive. Yet the guidelines seem to require the district courts to go above- to stack them, if you will, and impose consecutive sentences. And the net result seems to be, in many cases, that you're going beyond the statutory maximum that would otherwise be charged for a particular transaction or event. Well, Your Honor, I think ultimately the question is whether the court has the discretion to do this or not. And in this particular case, Judge Baird recognized that discretion and decided to do just so and sentence the defendant to a consecutive term. And obviously- So your argument in this case is that whatever that problem is that I just described, it didn't come into play here because she didn't feel bound by the guideline to impose consecutive sentences? She could have. She could have sentenced him to a concurrent sentence if that's what she wanted to do. She didn't decide to apply that discretion in this particular case and therefore sentenced him to what the guideline range was in terms of 310 months. With regards to Velazquez, though, I think in Velazquez, if the court obviously will read Velazquez, it talks about the discretion that the district court has. In Velazquez, the district court declined to impose a concurrent sentence. It had the opportunity to do so, or a consecutive sentence, and decided not to do so. On the opposite end, in this particular case, the court decided to do so. Whether or not she abused her discretion by doing so, the government would argue that that wasn't the case, that she was legally provided this opportunity and chose to do so. Thank you, counsel. You can respond. It won't be necessary to go over stuff you've already told us if you have any new points. Yes, of course. On the 404B evidence, I think the government's argument is essentially, and the argument about the coded language, et cetera, that goes to the question of whether he knew what he was doing was illegal. It doesn't go to the question of whether he had knowledge that the pills would be used to make methamphetamine. Does he have to show knowledge that the pills would be used to make methamphetamine or just a controlled substance? No. Well, the way it's charged is that he, and the way the case was brought, he knew it was to be used to make methamphetamine. And that's the way the instructions say controlled substance. I believe it actually does say controlled substance, if I recall. But the whole way the case was presented to the jury was that they had to show knowledge of the methamphetamine use of it. And that's why the evidence, the ecstasy evidence was presented to begin with. I don't think it was harmless. The government referred to it in closing argument on pages 56 and 57 of our excerpt of record. The government argues it cites the met, the ecstasy transaction and talks about how it was similar to the pill transaction and says it's similar to what occurred, what transpired. It goes to whether or not he had the knowledge that this stuff was going to be used to make meth. I don't see how they could say it's harmless if they refer to in closing argument. In their own brief on page 28, they say knowledge is the quote most critical element of the trial. So clearly it was important. It was introduced, recognized to be critical or important evidence in the case. And if it was there, I don't believe it was harmless. On the sentencing issue, there were two ways, two reasons the court should have struck the first object of the conspiracy. I refer to the first one that the second reason is based on the Perrone case out of the Second Circuit. The Perrone case talks about when you have a, in one count, a manufacturer of, in that case, cocaine, and the second count charging possession of the chemicals used to make cocaine. The court said you need to strike the count regarding manufacture of cocaine because Congress recognized that possession of the chemicals is less serious than the manufacturer. And so if you don't, and with that recognition, the court in Perrone struck the manufacturing count. The analogous situation here is that that first object, the manufacturing count, should have been stricken. The reason that's important is because the court below decided not to adopt Olaskaz based on the fact that our case was different because it had two objects. But if the first object was to be stricken, which I believe it should have been, then it, you were left with object two and the substantive count, conspiracy to possess the pills and possession of the pills. And under those circumstances, as Olaskaz indicates, the guidelines support the view that you should impose concurrent sentences. So had the district court been correct and had stricken the first object, then the district court may well have adopted Olaskaz and given him a lower sentence, perhaps 240 months as opposed to 310 months. So I think the district court made an error, and I think the basis of not following, if you want to say it's a discretionary decision, discretion was based on an error that the district court made. Had the court not made the error, the sentence may well have been lower. Thank you, Counsel. Thank you, Your Honor. The case has already been submitted. We move to the last case, CalSTAR v. First Union National Bank.
judges: Trott, Rymer, Thomas